# UNITED STATES DISTRICT COURT

_____NORTHERN_____ DISTRICT OF ___ILLINOIS, EASTERN DIVISION___

UNITED STATES OF AMERICA

v.

ENRIQUE SANCHEZ and
MISAEL OSORIO

CRIMINAL COMPLAINT

CASE NUMBER:

Under Seal

MAGISTRATE JUDGE SCHENKIER
08 CR 947

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _July 27, 2007_ in the ___Northern___ District of _Illinois_ defendant(s) did,

knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, mixtures containing a measurable quality of cocaine, a Schedule II controlled substance.

in violation of Title ___21___ United States Code, Section(s) _841(a)(1)_.

I further state that I am a(n) _Special Agent with FBI_ and that this complaint is based on the following
                                   Official Title
facts:

**SEE ATTACHED AFFIDAVIT**

FILED
11-20-08
NOV 20 2008 TC

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Continued on the attached sheet and made a part hereof: _X_ Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

_November 20, 2008_                          at       _Chicago, Illinois_
Date                                                           City and State

Sidney I. Schenkier
United States Magistrate Judge                    _____
Name & Title of Judicial Officer                      Signature of Judicial Officer

## AFFIDAVIT

I, Jason Ibrahim, being duly sworn under oath state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2002. I am currently assigned to the Chicago Division of the FBI. My duties include the investigation of violations of federal law involving the illegal possession, distribution, importation, and manufacture of controlled substances.

2. I have obtained the information contained in this affidavit from my personal involvement in the investigation, from interviews of a confidential human source, from consensual recordings, from conversations with other agents involved in the investigation, and from conversations with other individuals who have knowledge of the events and circumstances herein described. This affidavit is being prepared for the purpose of supporting a criminal complaint and arrest warrants for ENRIQUE SANCHEZ and MISAEL OSORIO, also known as ("a/k/a") ISAEL OSORIO, a/k/a RAFAEL PLANCARTE, a/k/a MANUEL PEREZ. More specifically, based on the information described below, I believe there is probable cause showing that ENRIQUE SANCHEZ and MISAEL OSORIO violated federal criminal law, specifically, that they possessed with intent to distribute and distributed a controlled substance, namely, mixtures containing a measurable amount cocaine, in violation of 21 U.S.C. § 841(a)(1). Because the purpose of this affidavit is merely to establish the requisite probable cause, it contains only a summary of the relevant facts and does not purport to exhaust all of the information I and other agents have developed in this investigation.

1

3.  In or around July 2007, FBI agents received information from a confidential human source ("CHS")[1] that MISAEL OSORIO was involved in the distribution of cocaine in the Chicago, Illinois, area. After being debriefed by law enforcmeent agents, the CHS agreed to attempt a controlled narcotics transaction with OSORIO. Accordingly, on or about July 26, 2007, at approximately 10:31 a.m., the CHS placed a consensually-recorded telephone call to OSORIO and asked him about the availability of a half-kilogram of cocaine. Your Affiant was present when the call was made. During the call, the CHS stated that he/she needed a half-kilogram of cocaine, referring to it as "half a worker."[2] OSORIO then urged the CHS to purchase a "whole one," understood by the CHS to be a whole kilogram of cocaine. The CHS reiterated that he/she needed only a half and asked how much it would cost, saying that he/she needed to "know the price of the worker" and asking how much the worker would cost "per hour." OSORIO replied that it would cost "11," understood by the CHS to be $11,000. The CHS suggested that OSORIO drop the price to "10 ½," referring to $10,500, to ensure future deals

---

[1] The CHS has multiple prior arrests for which he/she did not sustain any convictions. In or around mid-2006, FBI agents arrested the CHS on federal drug charges. The CHS started cooperating with the FBI following his/her arrest on those charges. In or around early 2007, the CHS pled guilty to one of his/her federal drug charges. The CHS was promised that any cooperation provided to the FBI would be made known to the United States Attorney's Office for the Northern District of Illinois for consideration with regard to the CHS' pending sentencing in that district. No other promises have been made to the CHS.

[2] Almost all of the recorded calls discussed in this Affidavit were conducted in Spanish and are currently in the process of being translated and transcribed. Quoted material in the summarized calls is based on draft--not final--transcripts completed by Spanish linguists and/or agents who are fluent in the Spanish language. For some of the recorded calls and conversations summarized below, I have included in brackets and otherwise my understanding of what is being said during the call based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement officers in this investigation, including our experience listening to the recorded conversations as a whole. The times listed for these calls are approximate.

with his/her "buddy," meaning his/her purported drug customer. OSORIO agreed to drop the price to $10,500 and suggested they do the deal later that afternoon. The CHS stated that he/she would check with his/her "buddy," meaning his/her purported drug customer, and would call OSORIO back.

4. At approximately 10:51 a.m. that same day, the CHS placed another consensually-recorded telephone call to OSORIO. Your Affiant and another agent were present when the call was made. During the call, the CHS asked if they were going to do "it," referring to the half-kilogram cocaine deal. OSORIO responded affirmatively. Later in the call, the CHS stated that, "Tomorrow . . . we'll do half a man," referring to half a kilogram of cocaine. The CHS then continued, saying, "I'll give you the money, you give me that thing [half kilogram of cocaine], and each one goes their separate ways." OSORIO asked if the CHS was "going to have the money tomorrow." The CHS told OSORIO not to worry. OSORIO then asked if the CHS was sure that he/she did not "want anything [cocaine] today." Towards the end of the call, the CHS and OSORIO agreed to meet the following afternoon to do the deal.

5. The following day, on or about July 27, 2007, the CHS made a controlled purchase of a half-kilogram of cocaine from OSORIO in exchange for $10,500:

(a) That day, starting at approximately 1:18 p.m., the CHS made several unsuccessful attempts to place consensually-recorded telephone calls to OSORIO to discuss the planned purchase of a half-kilogram of cocaine that day. At approximately 2:59 p.m. that day, the CHS received an incoming call from OSORIO. The telephone call was consensually recorded. Your Affiant and another agent were present when the call occurred. During the call,

3

OSORIO requested that the CHS meet him in the vicinity of Armitage and Cicero Avenues. The CHS stated that he/she would call OSORIO back.

(b) At approximately 3:03 p.m. that same day, the CHS received a second incoming call from OSORIO. The telephone call was consensually recorded. Your Affiant and another agent were present when the call occurred. During the call, the CHS and OSORIO agreed to meet at a Mexican restaurant called "Las Islas Marias" in the vicinity of 24th Street and Pulaski Road.

(c) At approximately 3:34 p.m. that same day, the CHS placed a consensually-recorded telephone call to OSORIO. Your Affiant and another agent were present when the call was made. During the call, the CHS stated that he/she was about "five minutes" away from the restaurant. OSORIO replied that he would be there by the time the CHS arrived and suggested they eat together. The CHS stated that he/she would not have time to eat.

(d) Prior to meeting with OSORIO, the CHS and the CHS' vehicle were searched for contraband with negative results. The CHS was given $10,500 in undercover funds in a white plastic bag to make the controlled purchase. The CHS was also outfitted with audio and video recording equipment and audio transmitting equipment. Agents established surveillance at the Mexican restaurant and, at approximately 3:43 p.m., observed OSORIO arrive at the restaurant in a Toyota Camry bearing Illinois temporary license plate 961H104.[3] Your Affiant and another FBI agent then followed the CHS to the Mexican restaurant and arrived there at approximately 3:49 p.m. that day.

---

[3] A check with Illinois Secretary of State records indicated that the Toyota Camry bearing Illinois temporary license plate 961H104 was registered to Individual B, who was also the listed subscriber of the phone used by OSORIO during the above-referenced consensually recorded calls.

(e) During the CHS' meeting with OSORIO, surveillance agents observed, among other things, OSORIO walk up to the front, driver's side window of the CHS' vehicle and then walk around and enter the front passenger seat of the CHS' vehicle. Approximately five minutes later, an agent observed the CHS and OSORIO exit the CHS' vehicle and enter the restaurant. Approximately 30 minutes later, an agent observed the CHS and OSORIO exit the restaurant and enter the driver's seat and the front passenger seat, respectively, of the CHS' vehicle. Moments later, agents observed the CHS exit the vehicle, remove the white plastic bag containing the $10,500 purchase money from the trunk of the vehicle, show the contents of the white plastic bag to OSORIO, and then return the white plastic bag to the trunk of the vehicle. Shortly thereafter, agents observed OSORIO walk over to and meet briefly with a Hispanic male, subsequently identified by agents as ENRIQUE SANCHEZ,[4] on the north side of the restaurant parking lot and then observed SANCHEZ walk away from OSORIO and retrieve a black plastic bag from the trunk of a silver Nissan Sentra bearing Illinois license plate 8054017.[5] Surveillance agents next observed SANCHEZ walk from the silver Nissan Sentra over to OSORIO and hand OSORIO the black plastic bag. Agents then observed OSORIO walk over to the CHS' vehicle, place the black plastic bag in the trunk of the CHS' vehicle, and take the white plastic bag containing the $10,500 purchase money from the trunk of the CHS' vehicle. Your Affiant and another agent then followed the CHS to a prearranged debriefing location.

---

[4] Following the controlled purchase of cocaine, agents viewed the digitally-issued photograph associated with SANCHEZ's Illinois driver's license and were able to confirm that SANCHEZ was the individual observed on surveillance during the controlled purchase.

[5] A check with Illinois Secretary of State records revealed that the gray Nissan sedan bearing Illinois license plate 8054017 was registered to Enrique Sanchez, 5317 W. Agatite Ave., Chicago, Illinois.

5

6. Upon arriving at the debriefing location, the CHS indicated that the cocaine purchased from OSORIO was in a black plastic bag in the trunk of his/her vehicle. Agents retrieved the black plastic bag at that time. A closer inspection of the contents of the black plastic bag revealed that it contained a white powdery substance wrapped in a clear plastic bag and further contained in a brown paper bag. The CHS and the CHS' vehicle were then searched with negative results. The CHS did not have the buy money. A subsequent chemical analysis of the substance in the black plastic bag conducted by the Drug Enforcement Administration's North Central Regional Laboratory indicated that the gross weight of the substance was 549.8 grams, that the net weight of the substance was 499.8 grams, and that it consisted of 88.8% cocaine hydrochloride.

7. The audio recording equipment on the CHS' person captured, among other things, the following:

(a) While the CHS was meeting with OSORIO at the Mexican restaurant, the audio recording equipment on the CHS' person captured portions of the CHS' ensuing conversations with OSORIO. When OSORIO first approached the CHS' vehicle, OSORIO can be heard saying, "Bring the money, so we can count it." The CHS then responded, "No, I want to see the thing [half kilogram of cocaine] first." Moments later, after surveillance agents had observed OSORIO enter the front passenger seat of the CHS' vehicle, OSORIO can be heard saying, "The guy's going to bring it [half-kilogram of cocaine] here in 10 minutes. . . . My brother's going to bring it here in 10 minutes." OSORIO then suggested that they go inside the restaurant "to have a beer."

(b) At approximately 3:53 p.m., while OSORIO was still sitting in the front passenger seat of the CHS' vehicle, the audio recording equipment on the CHS' person captured OSORIO's side of an outgoing telephone call that he made. After hearing an outgoing ring tone on the speaker function of a cellular telephone, OSORIO can be heard saying the following: "Are you on your way. . . . I don't want to eat anything now because this guy [CHS] wants to leave right away. . . . He's a good guy."

(c) At approximately 4:28 p.m., when the video recording showed OSORIO in the front passenger seat of the CHS' vehicle with a cellular telephone to his ear, OSORIO can be heard saying the following while talking on the telephone: "Come over here. We're in the parking lot." Around that same time, when the CHS was observed in the video recording and by surveillance agents retrieving the purchase money from the trunk and showing it to OSORIO, OSORIO can be heard saying, "I want to take a good look at them. Are they counterfeit?" The CHS then responded, "No."

8. After arriving at the debriefing location and while being debriefed by your Affiant and another agent, the CHS provided the following information about the controlled purchase of cocaine from OSORIO: After greeting OSORIO in the restaurant parking lot, OSORIO told the CHS that his brother had the cocaine and was on his way there. Moments later, at the CHS' request, OSORIO sat down in the front passenger seat of the CHS' vehicle. The CHS noticed that OSORIO had two cellular telephones, one of which the CHS recognized as a Nextel cellular telephone. OSORIO used the Nextel cellular telephone to place a call while he was sitting in the CHS' vehicle. After completing the call, OSORIO told the CHS that his brother was about 15 minutes away. The CHS then accompanied OSORIO inside the restaurant, where OSORIO

ordered and ate some food. When OSORIO finished eating, the CHS and OSORIO exited the restaurant and reentered the CHS' vehicle. OSORIO asked the CHS to give him the purchase money, which the CHS refused to do. OSORIO then asked the CHS to show him the purchase money. After agreeing to do so, the CHS exited the vehicle, retrieved the purchase money from the trunk, and showed it to OSORIO. About that same time, the CHS saw OSORIO use his Nextel cellular telephone again. At the conclusion of the call, OSORIO advised the CHS that his brother had arrived. Shortly thereafter, the CHS saw OSORIO meet with a Hispanic male (subsequently identified by agents as ENRIQUE SANCHEZ), whom OSORIO introduced to the CHS as "ENRIQUE." The CHS then saw SANCHEZ depart the area on foot. Around that time, OSORIO asked the CHS to reposition his/her vehicle due to the presence of surveillance cameras in the area. The CHS moved his/her vehicle and, shortly thereafter, saw SANCHEZ return to the area carrying a black plastic bag. The CHS saw SANCHEZ give the black plastic bag to OSORIO, who then asked the CHS to open his/her trunk. After the CHS opened the trunk of his/her vehicle, OSORIO placed the black plastic bag in the trunk and removed the white plastic bag containing the purchase money. The CHS then reentered his/her vehicle and drove away from OSORIO and SANCHEZ.

9. On or about August 2, 2007, your Affiant and another agent conducted a trash pull at 5317 West Agatite Avenue, Chicago, Illinois, the address attributed to ENRIQUE SANCHEZ on the registration of the gray Nissan sedan bearing Illinois license plate 8054017, which SANCHEZ was observed using during the CHS' controlled purchase of cocaine from OSORIO on or about July 27, 2007. In trash bins behind that residence, agents discovered, among other things, (i) an Enterprise Rent-A-Car receipt dated June 7, 2007, and listing the renter as

"ENRIQUE SANCHEZ," and (ii) suspected drug wrappings consisting of plastic wrap and rubber surrounded by duct tape.

10. Your Affiant subsequently subpoenaed and reviewed Enterprise Rent-A-Car records pertaining to the Enterprise receipt discovered in the trash behind the 5317 West Agatite Avenue residence. A review of the subpoenaed records confirmed that the renter associated with that particular transaction was "ENRIQUE SANCHEZ" of 5317 West Agatite Avenue, Chicago, Illinois.

11. Based on the above information, I believe there is probable cause showing that ENRIQUE SANCHEZ and MISAEL OSORIO violated federal criminal law, specifically, that they possessed with intent to distribute and distributed a controlled substance, namely, mixtures containing a measurable amount cocaine, in violation of 21 U.S.C. § 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
Jason Ibrahim
Special Agent
Federal Bureau of Investigation

Subscribed and Sworn to before
me this 20TH day of November 2008

_____
Sidney I. Schenkier
United States Magistrate Judge